762 F.2d 1013
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
WILLIAM EUGENE 'BILLY' SIDES (83-5875, 83-5876), CHARLES
GLENWOOD 'PETE' FISHER (83-5878), DEFENDANTS-APPELLANTS.
 NO. 83-5875, 83-5876, 83-5878
 United States Court of Appeals, Sixth Circuit.
 3/12/85
 
 On Appeal from the United States District Court for the Western District of Tennessee
 BEFORE: KEITH and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 This is an appeal by two co-defendants from convictions for counterfeiting and illegal possession of a firearm. On March 2, 1983, a federal grand jury for the Western District of Tennessee returned a five count indictment charging William E. 'Billy' Sides and Charles 'Pete' Fisher among others with conspiracy to manufacture, pass and deliver counterfeit United States Savings Bonds, in violation of 18 U.S.C. Sec. 371; Sides was also charged with making counterfeit United States Savings Bonds, in violation of 18 U.S.C. Sec. 471; while Fisher was also indicted for delivering the bonds, in violation of 18 U.S.C. Sec. 473, and possessing counterfeit bonds, in violation of 18 U.S.C. Sec. 472. In a separate indictment, Sides was also charged for possession of an unregistered firearm, in violation of 26 U.S.C. Sec. 5861(d), and being a felon in possession of a firearm, in violation of 18 U.S.C. Appendix Sec. 1202.
 
 
 2
 The court joined the two cases for trial on June 6, 1983. Following a jury trial, both men were found guilty. Fisher received two years each for two counterfeiting counts to be served concurrently, while Sides received two years on each of four counterfeiting violations, to be served concurrently, and one year on the firearms charge to be served consecutively to the counterfeiting sentence. Both of Sides' sentences were to be consecutive to the prison term he was then serving. On appeal, Sides and Fisher assert various procedural errors and claim the evidence was insufficient to sustain their convictions. For the reasons stated below we affirm the judgment of the district court.
 
 A.
 FACTS
 
 3
 On October 21, 1982, agents of the United States Secret Service recovered two suitcases from the automobile of Mary Ann Scott, defendant Sides' sister-in-law. One suitcase contained $57,300 in counterfeit United States Savings Bonds in one hundred dollar denominations, printing plates, negatives, counterfeit identification and checks. The other suitcase contained a sawed-off rifle. The rifle was manufactured by Marlin Firearms Company of Connecticut and had been shortened to an illegal length. Mary Ann Scott had picked up the suitcases from another relative, Opal Jacobs, on October 21, 1982, and stored them in her car. She was going to call Sides to come get them as she had been advised they belonged to him.
 
 
 4
 Donna Jacobs, granddaughter of Opal Jacobs, helped move the suitcases to Opal Jacobs' residence with the help of her aunt, Mary Ann Scott, in late 1981 or early 1982. At trial, Mary Ann Scott denied helping move the suitcases. Donna Jacobs identified the suitcases containing the counterfeit bonds and firearms in evidence as being the ones stored under her bed at Opal Jacobs' house. At trial, Donna Jacobs told of informing Sides that the suitcases were under her bed and that she wanted them moved. Sides replied by telling her to be quiet and not to say anything about the suitcases.
 
 
 5
 James Johnson testified that he spent time in prison with co-defendant Roy Mahar.[1] Upon Johnson's release in October 1981, he contacted Mahar who, along with Fisher, picked him up at the bus station in Memphis. After stopping at some local bars, Johnson went with Mahar and Fisher to their trailer. Johnson was informed that Fisher and Mahar had 'a little operation going' and shown counterfeit bonds and false identification. Mahar told Johnson they were giving him a packet of bonds to take with him to try and see how they worked. Mahar and Fisher then drove Johnson to his home in East Tennessee, leaving some of the bonds and identification with him. Johnson was arrested after he used some of the bonds as collateral for a loan.
 
 
 6
 Surveillance by Federal Bureau of Investigation agents showed Sides, Mahar and Fisher present at the trailer in early February 1982. Seven of the counterfeit bonds were recovered by the Federal Bureau of Investigation after a search of the trailer on February 8, 1982. Bruce Pagano, a counterfeit specialist with the United States Secret Service, identified the negative of the bond showing the name of William E. Sides, as one of the items recovered from the suitcase containing the bonds, and as the pattern bond used in printing the counterfeit bonds. Pagano also stated that all the counterfeit bonds were printed from the same plates and negatives. Two genuine one hundred dollar bonds payable to William E. Sides were redeemed on June 28, 1979, and the process deposited in a savings account in his name. A twenty-five dollar bond, sold on May 30, 1979, in the name Charles Scott, was used to produce the serial number of the counterfeit bonds. Fingerprints of Fisher and Sides were identified on items in the suitcase containing the counterfeit bonds.
 
 B.
 WILLIAM E. 'BILLY' SIDES
 
 7
 Initially, we address the claims of appellant Sides. Sides contends that the government improperly joined the counterfeit and firearms indictments; that the government committed reversible error by not timely informing him of the exculpatory nature of Opal Jacobs' testimony before the grand jury and; that the evidence was insufficient to sustain his conviction for illegal possession of a firearm. We address the latter claim first.
 
 
 8
 In addressing this claim we must review the evidence and view it in the light most favorable to the government United States v. Glasser, 315 U.S. 60, 80 (1942). Specifically we must take all inferences that can 'reasonably and justifiably' be drawn from the evidence in the light most favorable to the government to determine if 'a verdict against [Sides] might have been lawfully rendered.' United States v. Wolfenbarger, 426 F.2d 992, 994 (6th Cir. 1970) (quoting from Blalock v. United States, 154 F.2d 591 (6th Cir. 1946).
 
 
 9
 The sawed-off rifle was recovered from one of two suitcases which were retrieved from a relative of Sides. The other suitcase contained items with Sides' name and fingerprints. Another relative of Sides, Donna Jacobs, told Sides to remove the suitcases from under her bed and he told her to be quiet about the suitcases. Viewed in the light most favorable to the government, these facts could reasonably sustain Sides' conviction for illegal possession of a firearm. The government must show that the defendant possessing the firearm was in or effecting commerce. Commerce means travel, trade, traffic, commerce, transportation or communication among the several states of the United States. 26 U.S.C. Sec. 5861(d); 18 U.S.C. App. Sec. 1202. All elements of the crime were established. The proof showed that the weapon was manufactured in Connecticut and recovered in Tennessee. We have previously held that 'proof that a firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the possession was in or affecting commerce.' Watkins v. United States, 654 F.2d 201, 204 (6th Cir. 1977), cert. denied, 435 U.S. 976 (1978). In our view there was sufficient evidence to show that Sides possessed the sawed-off rifle and that the weapon was in or affecting commerce.
 
 
 10
 We next address Sides' contention that the government improperly joined the indictments for the counterfeit and firearms offenses. Under rule 8(a) of the Federal Rules of Criminal Procedure, offenses based on acts or transactions which are connected or are part of a common scheme or plan may be tried together. The counterfeit and firearms violations were acts which were connected and were a part of a common scheme or plan. Both suitcases were found together in the trunk of Mary Ann Scott's car and other testimony shows that Sides' was aware the suitcases were kept together while being sorted in Opal Jacob's house. Also, since the suitcase containing the counterfeit bonds and the suitcase containing the rifle were stored at the same place and were recovered together, evidence pertaining to the counterfeit charges would also have been admissible in a trial of the firearms indictment to show identity and knowledge. Rule 404(b), Fed. R. Evid.; See also U.S. v. Park, 531 F.2d 759 (5th Cir. 1976); U.S. Valentine 706 F.2d 282, 289 (10th Cir. 1983) (joinder of firearms and drug offenses which arose from one search held to be proper).
 
 
 11
 Trial courts have great discretion in deciding whether to grant a severance. Rule 14 Fed. R. Crim. Pro.; United States v. Harris, 635 F.2d 526, 527 (6th Cir. 1980). In order to show that the trial court erred in not permitting a severance, Sides' must show that he was prejudiced by joinder and that the trial court abused its discretion. Sides cannot prove these claims in the case at bar. We have held that '[j]oinder of the other crimes cannot prejudice the defendant more than he would have been by the admissability of the other evidence in a separate trial.' Harris at 527. In the instant case, the court did not abuse its discretion by joining for trial two indictments charging different offenses that arose from the same transaction, especially since proof of one offense was admissible at trial of the other offense to show knowledge and identity. Joinder of the offenses for trial was proper. In our view, Sides has shown no prejudice under Rule 14, therefore the decision of the district court to try the indictments together was not an abuse of discretion and should be pheld.
 
 
 12
 Finally, we address Sides' contention that the government committed reversible error with respect to the testimony of Opal Jacobs. Sides alleges that the testimony of Opal Jacobs was exculpatory and not timely produced by the United States. Opal Jacobs testified before the grand jury that she had not seen the suitcases prior to receiving a call from Donna Jacobs' other. Donna Jacobs testified at trial that Opal Jaocbs was present when the suitcases were opened, some period of time before the telephone call from Donna Jacobs' mother. Thus, Opal Jacobs' testimony is inconsistent as to when she first became aware of the suitcases in her house not as to their actual presence or content.
 
 
 13
 Because Opal Jacobs' statements did not call into serious question the presence of the suitcases in her house, Sides' ownership of the cases, or the content of the suitcases, her testimony was not exculpatory. However, because the testimony was inconsistent the government put the defense on notice that it was not going to call Opal Jacobs and stated the substance of the inconsistencies so that the defense could call her if they so desired. Jt. App. at 110. Counsel for Sides had previously inquired about whether the government would call Opal Jacobs and was told he should get his own witnesses there rather than expect the government to subpoena them. Jt. App. at 38-9. This conversation occurred prior to the testimony of Donna Jacobs.
 
 
 14
 Both the Grand Jury testimony and a signed statement of Opal Jacobs were provided to the defense. Jt. App. at 128. She was called as a witness by the defense and testified at the trial. Sides alleges that her testimony was exculpatory not only because of the inconsistency of her statements with those of Donna Jacobs, but also because Donna Jacobs had used drugs. Opal Jacobs never testified at trial concerning any drug usage that might have affected Donna Jacobs' testimony.
 
 
 15
 Even assuming arguendo, that Opal Jacobs' testimony was exculpatory, the defense was fully advised of it and the witness was available and was called to testify. We continue to be of the view that where allegedly exculpatory material was uncovered during the government's case in chief and the information was 'discovered in time for full and adequate correction,' there was no error. United States v. Enright, 579 F.2d 980, 989-90 (6th Cir. 1978).
 
 
 16
 By informing the defense that Opal Jacobs had testified contrary to Donna Jacobs and by providing Opal Jacobs' Grand Jury testimony and signed statement to the defense for their use, the government did all that it could be expected to do. There was no error committed by the United States with respect to the testimony of Opal Jacobs. Accordingly, we find none of Sides' claims persuasive and affirm his convictions.
 
 C.
 CHARLES GLENWOOD 'PETE' FISHER
 
 17
 Next we address the contentions of defendant Fisher. Fisher contends that the court erred in denying his motion for a severance and alternatively that the evidence is insufficient to sustain his conviction. Rule 14 of the Federal Rules of Criminal Procedure provides in part that 'if it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment . . . the Court may . . . grant a severance of defendants or provide whatever relief justice requires.' The defendant has the burden of demonstrating that severance is proper, and this burden will be sustained upon a showing of actual prejudice resulting from the joint trial. United States v. LaFerriere, 546 F.2d 182, 184 (5th Cir. 1977); United States v. Morrow, 537 F.2d 120 (5th Cir. 1976).
 
 
 18
 Fisher alleges he was prejudice by his joint trial with Sides because Sides was also charged with the firearms violation which inferred that all defendants were involved in a pattern of violent behavior. Given this assertion, we must determine whether it was an abuse of discretion for the district court to deny the severance. United States v. Markey, 693 F.2d 594, 597 (6th Cir. 1982). A severance is required where the evidence becomes so confusing or complex that the jury cannot make an individual determination of each defendant's guilt. See United States v. Kendricks, 623 F.2d 1165, 1168 (6th Cir. 1980). The firearms charges was neither confusing nor complex. It inferred nothing as to the defendant Fisher. Only Sides was charged with a weapons violation and there was no proof nor any suggestion that Fisher had anything to do with the sawed-off rifle. Fisher has failed to show any prejudice sufficient to demonstrate that the district court abused its discretion in denying his motion for severance.
 
 
 19
 Finally, we address Fisher's contention that the evidence is insufficient to sustain his convictions. The evidence, properly considered in the light most favorable to the United States, shows that Fisher accompanied Mahar to pick Johnson up at the bus station after his release from prison. Jt. App. at 60-62. After visiting several bars, Fisher, Mahar, and Johnson went to the trailer where Fisher and Mahar lived. Fisher showed Johnson the counterfeit bonds and false identification and told him 'they had a little operation going.' Jt. App. at 63-4. Mahar, in Fisher's presence, told Johnson they were going to give him a package of the bonds and false identification to try out and see how they worked. Fisher and Mahar then drove Johnson to his home in East Tennessee, leaving approximately twenty of the bonds and some of the false identification with him. Fisher and Mahar continued to reside at the trailer and were observed there along with Sides, in early February 1982. Seven of the counterfeit bonds were recovered from the trailer after a search on February 8, 1982.
 
 
 20
 Fingerprint analysis showed one of the Fisher's prints on one of the items in the suitcase which contained the counterfeit bonds, plates, negatives, and false identification. The evidence against Fisher shows that he and Mahar delivered counterfeit bonds to Johnson with the intent that Johnson try them out to see whether they were any good. Fisher and Mahar used Johnson, who they knew had a history of criminal activity, to make the tests. That Johnson was unsuccessful in passing the bonds does not diminish the fact that Fisher and Mahar conspired to deliver counterfeit bonds to another person to be passed as genuine with the expectation that they would eventually reap some financial reward from their criminal activity. We find the evidence of Fisher's participation in the conspiracy sufficient to sustain his conviction. In sum, we find neither of Fisher's claims to be persuasive. Thus, we also affirm appellant Fisher's convictions.
 
 
 21
 Accordingly, the judgment of the Honorable Robert M. McRae, Jr., United States District Court for the Western District of Tennessee, is affirmed.
 
 
 
 [1]
 Roy Mahar had appealed his convictions but subsequently abandoned the effort